```
 1                      UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF FLORIDA
 2                            MIAMI DIVISION
                        CASE NO. 22-MJ-03273-DAMIAN
 3

 4
      UNITED STATES OF AMERICA,            Miami, Florida
 5
                   Plaintiff,              August 1, 2022
 6
      vs.                                  Pages 1 to 39
 7
      AARON THOMAS MITCHELL,
 8
                   Defendant.
 9    _____

10

11                     REMOVAL/DETENTION HEARING
                BEFORE THE HONORABLE LAUREN FLEISCHER LOUIS
12                  UNITED STATES MAGISTRATE JUDGE
                   (TRANSCRIPT OF DIGITAL AUDIO RECORDING)
13
      APPEARANCES:
14
      FOR THE GOVERNMENT:      FRANK TAMEN, ESQ.
15                             AEJEAN CHA, ESQ.
                               UNITED STATES ATTORNEY'S OFFICE
16                             99 Northeast Fourth Street
                               Miami, Florida 33132
17

18    FOR THE DEFENDANT:       ANDREW JACOBS, ESQ.
                               ASSISTANT FEDERAL PUBLIC DEFENDER
19                             FEDERAL PUBLIC DEFENDER'S OFFICE
                               150 W. Flagler Street
20                             Suite 1500
                               Miami, Florida 33130
21
      TRANSCRIBED BY:
22
                               PATRICIA DIAZ, FCRR, RPR, FPR
23                             Official Court Reporter
                               United States District Court
24                             400 North Miami Avenue
                               11th Floor
25                             Miami, Florida 33128
                               (305) 523-5178
```

1        (PROCEEDINGS TRANSCRIBED FROM DIGITAL AUDIO RECORDING)

2            COURTROOM DEPUTY:  Calling United States versus Aaron

3    Thomas Mitchell, case number 22-3273-Magistrate Judge Damian.

4            Counsel, please announce your appearances for the

5    record.

6            MR. TAMEN:  Good morning, Your Honor, Frank Tamen for

7    the United States, and with me who is going to be covering this

8    hearing is Department of Justice Civil Rights Division Attorney

9    Aejean Cha.

10           MS. CHA:  Good morning, Your Honor, Aejean Cha with the

11   United States.

12           THE COURT:  Thank you, Ms. Cha.

13           MR. JACOBS:  Good morning, Your Honor.  Andrew Jacobs

14   from the Federal Public Defender's Office on behalf of

15   Mr. Mitchell.

16           THE COURT:  Okay.  Thank you, Mr. Jacobs, Mr. Mitchell.

17   I have you on for two proceedings this morning, removal and

18   detention hearing.

19           Before we go any further, can I confirm, I have heard

20   the phone go a couple of times.  Do I have with me the

21   out-of-district persons who wanted to attend this hearing?  You

22   can either verbalize or Ms. Cha, have you been in contact with

23   the participants that you sought permission to be here by

24   phone?

25           MS. CHA:  I have not talked to them this morning, but I

1    can check my phone or perhaps the agent can contact them to see

2    if they have gone on the line.

3             THE COURT:  I appreciate it because I know that they

4    have a right to be here and they sought to be here, so let's

5    make sure that technology is on their side.

6             Okay.  I will just ask Mr. Jacobs, what's our intention

7    with the removal hearing?  Are you just going to roll them into

8    the same proceeding or --

9             MR. JACOBS:  We have a waiver of removal and the

10   preliminary, but we are ready to conduct the pretrial detention

11   hearing here in the Southern District.

12            THE COURT:  Do you mind if I go ahead and do that

13   because otherwise I may forget after the detention hearing?

14            So, if you have --

15            MR. JACOBS:  Okay, Your Honor.

16            THE COURT:  Please.

17            Okay.  Mr. Mitchell, when you made your initial

18   appearance in this district, another judge advised you of the

19   rights that you have when you are charged in one district and

20   arrested in another, as is what's happening in your case,

21   right?  You're being charged in Arizona.  Right?

22            THE DEFENDANT:  Yes, Your Honor.

23            THE COURT:  All right.  But you have been picked up

24   here.

25            Before I can commit you to that other district, send

```
1    you there, you have the right to have certain proceedings
2    conducted here.  It's my understanding, because I am holding a
3    waiver that appears to bear your signature, that you have
4    decided to waive your right to certain proceedings here.  So
5    let me make sure that you understand that you know that you
6    have been charged in another district and you have been
7    apprised of those charges.
8              You have counsel appointed to represent you here in
9    this district, Mr. Jacobs.  Have you consulted with Mr. Jacobs
10   about the rights that you have to those proceedings here,
11   specifically the preliminary hearing and the identity or
12   removal hearing and production of the warrant?  Have you talked
13   to him about that?
14             THE DEFENDANT:  Yes, Your Honor.
15             THE COURT:  Do you feel that you understand what would
16   happen at those proceedings, specifically, the removal hearing?
17   I have to take make sure that the Government can adduce proof
18   that you are the person who is wanted in Arizona and the
19   preliminary hearings relate to probable cause.
20             It's my understanding, though, that it's an indicted
21   case.  Right?
22             MR. JACOBS:  Yes, Your Honor, it has been indicted.
23             THE COURT:  All right.  Do you understand what would
24   happen at those proceedings?
25             THE DEFENDANT:  Yes, Your Honor.
```

1          THE COURT:  After consulting with counsel, is it your

2    decision to waive the right to those proceedings in this

3    district and have the case move to Arizona?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Okay.  Then I will accept your waiver as

6    knowing and voluntarily entered.  Let me just confirm that the

7    signature on this waiver is, in fact, your signature?

8          THE DEFENDANT:  It is, Your Honor.

9          THE COURT:  Before you signed it, did you understand

10   the rights you would be giving up?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  All right.  I have added my signature and

13   we will get you moving, get the case going.

14         Have we confirmed that the participants and witnesses

15   or victims are on the line?

16         MS. CHA:  Your Honor, we have not been able to confirm

17   that this morning yet.

18         THE COURT:  Okay.  If you are present with me on the

19   phone, can I get a verbal yes, I am here?

20         Could we ask that question in Spanish?

21         (Interpreter translating.)

22         MS. CHA:  Your Honor, I just received confirmation that

23   they are on.

24         THE COURT:  All right.  Can we further get confirmation

25   because embedded in the e-mail request to me asked about an

1    interpreter so are the victims meaningfully able to understand

2    and participate?

3            I'd like to know.

4            Could the interpreter ask if the folks on the phone

5    need help with interpretation because we may have a logistical

6    issue of setting that up?

7            The other concern that I have is that I keep hearing

8    someone join and drop off and join so I don't know the current

9    status.

10           Mr. Jacobs, I don't mean to leave you iced here, but I

11   just want to make sure that logistically we get this going.

12           MR. JACOBS:  No problem, Your Honor.

13           THE COURT:  Will the interpreter ask one more time?  I

14   just am not sure that we're addressing them now.

15           Ms. Cha, I don't know the extent to which you want to

16   use names.

17           I don't know if these folks know that we are trying to

18   reach them.

19           MS. CHA:  I believe the agent just stepped out and he

20   is picking up the phone to call them.

21           THE COURT:  Oh, okay.

22           THE INTERPRETER:  Your Honor, should the interpreter

23   attempt to ask the question again?

24           THE COURT:  Hi.

25           MS. OLIVAS:  Your Honor, this is Jessica Olivas.  I'm

1    the victim witness advocate in the U.S. Attorney's Office in

2    the District of Arizona.

3            We are hoping that the victims are on the line.  We are

4    not quite sure but we have a plan to call them right afterwards

5    to update them of what is going on.  So I wanted to let you

6    know, they do have the contact information but we are not sure

7    if they are on the line.  We have been trying to reach them.

8            THE COURT:  All right.  Here is just my issue.  I just

9    want to make sure, and if you can confirm that the victims have

10   been provided the time and information for the hearing.

11           Can you confirm that for me?

12           MS. OLIVAS:  Yes, I can, Your Honor.

13           THE COURT:  And as you may have just heard, someone

14   e-mailed me a question about interpretation and I don't know

15   whether or not that request came from you or whether these

16   folks have been told one way or the other about interpretation,

17   but is it your understanding that they can't participate unless

18   someone interprets for them?

19           MS. OLIVAS:  Yes, they can't, Your Honor.  But if that

20   wasn't going to be available, myself and the agent were going

21   to provide interpretation.

22           THE COURT:  Okay.  So then let me just leave it here.

23           Are there any other requests on behalf of the victims

24   or can I go ahead and start this hearing?

25           MS. OLIVAS:  You can start, Your Honor, thank you.

1          All right.  With that, I will turn back to the

2   Government.  I have received both your memoranda.

3          Mr. Jacobs, I received yours over the weekend and I

4   have read both.  Again, in case I forget to say it at the end

5   of the hearing, both were excellent and exceptionally helpful.

6   It's such a rarity that I get memorandum in advance of a

7   detention hearing, and I just wanted to say thank you.

8          But with that, I also saw some request to show video

9   and photos and it does not seem, based on what I have read from

10  both of you, that there are many facts that are meaningfully in

11  dispute, so I don't know what evidence either side needs to

12  advance here because it seems like the facts that are disputed

13  are few.

14         MS. CHA:  Your Honor, we have the videos available

15  should the Court like to see them, and we have provided them to

16  Mr. Jacobs.  But we would agree that it does not appear that

17  the facts are in dispute, that the weight of the evidence is

18  strong in this matter.

19         THE COURT:  But the video specifically -- I mean, I saw

20  the pictures, the stills from outside the apartment.

21         Is there anything else that -- well, let me just ask

22  here, Mr. Jacobs, is there anything you would like to cross the

23  agent that we would need the video for?

24         MR. JACOBS:  That I would need the video for, no.

25         I do think there are other factual issues, not

1   necessarily about the allegations themselves but about, for

2   instance, what evidence the Government had at the time.

3           THE COURT:  You are going to have a fulsome opportunity

4   to cross the agent.  I don't mean to suggest otherwise.  I just

5   want to get, again, to the technology part of it, do I need to

6   have this video displayed in court?

7           MS. CHA:  Your Honor, only if the Court wishes to see

8   it but if the Court does not wish to see it we do not plan to

9   put it on.

10          THE COURT:  Okay.  If there is anything that comes out

11  at the hearing that I think would be guided by the video, I

12  will ask for it, but at this point I will just ask, again,

13  having read both your memoranda, it seems to me that I

14  always -- the way my practice works is that I pursue the

15  evidence and then I do argument.

16          So, having read what would be your proffer, it seems to

17  me that we should just call the agent, unless there is anything

18  additional that you need to add to that proffer?

19          MS. CHA:  We have nothing additional to add, Your

20  Honor.

21          THE COURT:  Okay.  Mr. Jacobs, do you wish to inquire?

22          MR. JACOBS:  Yes, Your Honor, thank you.

23          THE COURT:  Okay.  I will have the agent come forward.

24          (The witness, Russell Jewell, was duly sworn.)

25          COURTROOM DEPUTY:  Please be seated.  Speak into the

1    microphone.

2         Can you state your name, spell your last name for the

3    record and tell us where you're employed.

4         THE COURT:  My name is Russell Jewell.  That's spelled

5    J-E-W-E-L-L.  I am employed by the Federal Bureau of

6    Investigations assigned to the Phoenix Field Office, working

7    out of the Sierra Vista, Arizona RA.

8                           DIRECT EXAMINATION

9    BY MR. JACOBS:

10   Q.  Good morning, Special Agent Jewell.

11   A.  Good morning.

12   Q.  How long have you been with the FBI for?

13   A.  Twelve years.

14   Q.  I want to first talk about the various pieces of evidence

15   in this case.  Okay?

16   A.  Okay.

17   Q.  My understanding is that the alleged victim, MV, was

18   interviewed on April 25th, 2022.  Correct?

19   A.  Correct.

20   Q.  And that's the same day that this alleged incident took

21   place?

22   A.  Correct.

23   Q.  It's my understanding there were two SANE exams conducted.

24   Correct?

25   A.  Correct.

```
 1   Q.   The first, again, was on April 25th?

 2   A.   Correct.

 3   Q.   And then a second was performed on May 10th.  Is that

 4   right?

 5   A.   I don't recall the exact date, but it was sometime after

 6   the initial exam.

 7   Q.   Okay.  Were there any reports produced from those SANE

 8   exams?

 9   A.   Yes.

10   Q.   You have reviewed those?

11   A.   Yes.

12   Q.   Do you remember when they were dated?

13   A.   I don't recall the dates off the top of my head, no.  If

14   you can provide them to me, I will be happy to provide those

15   dates.

16   Q.   I don't have them, I'm sorry.

17   A.   Okay.

18   Q.   The defendant was taken into custody on April 26th.

19   Correct?

20   A.   That sounds correct.

21   Q.   And he gave a statement.  Is that right?

22   A.   Right, correct.

23   Q.   The same day?

24   A.   Right, correct.

25   Q.   There is some video evidence or video surveillance evidence
```

1    in this case.  Correct?

2    A.  Correct.

3    Q.  And that was obtained on April 27th?

4    A.  Correct.

5    Q.  And then Mr. Mitchell's phone was seized when he was

6    arrested.  Is that right?

7    A.  That is correct.

8    Q.  When was the analysis of his phone done?

9    A.  I don't -- I didn't conduct the analysis myself.  That was

10   done by another officer.  The exact date I can't give you that.

11   I don't know.

12   Q.  Was that done by state law enforcement or FBI?

13   A.  So, it was a detective from Douglas Police Department who

14   is also a task force officer for the FBI, so he works within

15   our office but also as a detective with Douglas Police

16   Department.

17   Q.  And that photo was, again, seized when he was -- when

18   Mr. Mitchell was taken into custody on the 26th?

19   A.  When he was taken into custody.  Correct?

20   Q.  You mentioned that you have been an FBI agent for 12 years.

21       Is that right?

22   A.  Right, correct.

23   Q.  Do you remember all the steps it took to apply to be a

24   special agent?

25   A.  It's been some time, but, yeah.

1    Q.   Okay.  You filled out an SF-86.  Is that right?

2    A.   That's correct, yes.

3    Q.   Can you tell the Court what's an SF-86?

4    A.   An SF-86 is basically one of the initial steps taken for

5    somebody applying to federal -- for a security clearance,

6    basically, and it has information of your background,

7    information of where you lived, people you know, your

8    employment history.

9         They are pretty comprehensive.  It's for a background

10   investigation, so that's what it's for.

11   Q.   Let's talk about the background investigation.  Based on

12   your answers to the SF-86, an agency conducts a background

13   investigation.  Right?

14   A.   That is correct.

15   Q.   And so they talk to people from your past?

16   A.   Generally, yes.

17        MS. CHA:  Objection as to the relevance.

18        THE COURT:  The relevance I understand, and Mr. Jacobs,

19   just so you know, judges also do the exact same process so it's

20   known to the Court.

21        MR. JACOBS:  I will move on then.  Thank you, Your

22   Honor.

23   BY MR. JACOBS:

24   Q.   You took a polygraph, though.  Right?

25   A.   Yes, for the FBI you do.  I don't know how other agencies

1   do it.  Some agencies require that.  Some do not.  I don't

2   know, that's agency dependent.

3   Q.   Okay.  Polygraphs are also very probing?

4   A.   The one I took was, yes.

5   Q.   They talk about alcohol use.  Correct?

6   A.   It talks about mostly what's in the SF-86.

7   Q.   Right.

8   A.   Correct.

9   Q.   So criminal history.  Yeah?

10  A.   Correct.

11  Q.   Financial history?

12  A.   You know, honestly, you are asking me questions that I

13  don't know what his polygraph -- if he took one.  They vary

14  from agency to agency --

15  Q.   Okay.

16  A.   -- so, honestly, I am not comfortable speculating on what

17  each individual goes through for polygraphs.

18       In general, yes, polygraphs are taken.  I would be

19  speculating onto what each polygraph and polygrapher asks each

20  individual.

21  Q.   But yours was probing?

22  A.   I mean, it asks basic information off the SF-86.

23  Q.   Okay.  Mr. Mitchell voluntarily surrendered here in Miami

24  on July 27th.  Is that correct?

25  A.   That's correct.

1    Q.   So he drove from his parents' house to the Miami, I guess

2    the FBI Miami Field Office in Miramar?

3    A.   I don't know how he got there, but he -- from what I

4    understand, he did show up to the FBI office, right.

5    Q.   Did he surrender his passport?

6    A.   I do not know.  I wasn't there.  I do not know.

7             MR. JACOBS:  Okay.  Those are all the questions I have,

8    Your Honor.

9             THE COURT:  Ms. Cha.

10                        CROSS-EXAMINATION

11   BY MS. CHA:

12   Q.   I have only one area to follow up on with you.

13   A.   Yes.

14   Q.   Special Agent Jewell, in this particular case did the

15   victim immediately outcry to her friends and family?

16   A.   That's correct, yes.

17   Q.   Did she report it immediately to the police or was it her

18   family members who encouraged her to report it to the police.

19   A.   It was her family members who encouraged her.

20   Q.   And do you understand that her family members asked her why

21   she didn't directly report it to the police?

22   A.   Yes.

23   Q.   What do you understand she said?

24   A.   From what I understand, she was concerned about this

25   incident which took place which was conducted by a police

1   officer or someone who represented themselves and she was not

2   comfortable -- she feared for going to the police to basically

3   report another police officer.

4   Q.   So, in essence, because she believes it was an officer who

5   did this sexual assault, she feared reporting it directly to

6   the police?

7   A.   Yes.

8            MS. CHA:  Thank you.

9            THE COURT:  Any follow-up?

10            MR. JACOBS:  No, Your Honor.

11            THE COURT:  All right.  Thank you, Agent Jewell.

12            THE WITNESS:  Thank you.

13            THE COURT:  Ms. Cha, do you have any additional

14   evidence you would like to advance?

15            MS. CHA:  We don't, Your Honor.

16            THE COURT:  Mr. Jacobs, sticking with the evidentiary

17   portion of the hearing first, do you have anything else that

18   you wish to advance?  I am aware of the exhibits you attached.

19            MR. JACOBS:  I do, Your Honor.  I was going to call

20   Thomasena Mitchell, Mr. Mitchell's mother.

21            THE COURT:  Okay.  Ms. Mitchell, can you come forward?

22            MR. JACOBS:  Just to orient the Court, Your Honor, the

23   reason for this witness, Mr. Mitchell did not complete a

24   Pretrial Services Report on advice of his state counsel in

25   Arizona, so I think Mrs. Mitchell will be able to answer a lot

1   of the questions that would ordinarily be in the PRS report.

2           THE COURT:  Okay.  I appreciate that.

3           COURTROOM DEPUTY:  Raise your right hand.

4           (The witness, Thomasena Mitchell, was duly sworn.)

5           COURTROOM DEPUTY:  Thank you.

6           Please be seated.  Speak into the microphone.  State

7   your name and spell your first and last name for the record.

8           THE WITNESS:  Thomasena Mitchell.

9           THE COURT:  Would you spell your first name for me,

10  please?

11          THE WITNESS:  Sure, T-H-O-M-A-S-E-N-A.

12          THE COURT:  And Mitchell is spelled the same as your

13  son?

14          THE WITNESS:  Yes, ma'am.

15                      DIRECT EXAMINATION

16  BY MR. JACOBS:

17  Q.  Good morning, Mrs. Mitchell.

18  A.  Good morning.

19  Q.  What do you do for a living?

20  A.  I am a retired police sergeant.

21  Q.  And so prior to retiring, where were you a police officer?

22  A.  Miami-Dade Police Department.

23  Q.  And how long did you do that for?

24  A.  Thirty years.

25  Q.  And are you married?

```
 1   A.   I am.

 2   Q.   To who?

 3   A.   Samuel Mitchell, Jr.

 4   Q.   Is that Mr. Mitchell's father?

 5   A.   Yes, it is.

 6   Q.   Okay.  And what did he do for a living?

 7   A.   He was a Miami Beach police officer, retired also.

 8   Q.   How long did he do that for, if you know?

 9   A.   Twenty-eight years.

10   Q.   Okay.  Do you own a home?

11   A.   Yes, we do.

12   Q.   Where is that home?

13   A.   In Miami Gardens.

14   Q.   When did you buy it?

15   A.   In the nineties.  I am not sure the exact year.

16   Q.   Okay.  Is it paid off or is there still a mortgage?

17   A.   There is a small mortgage on it.

18   Q.   Where was Mr. Mitchell born?

19   A.   In Miami.

20   Q.   Where did Mr. Mitchell go to school?

21   A.   He attended local Catholic schools.

22   Q.   Local meaning Miami?

23   A.   Yes, sir, Miami.

24   Q.   Did Mr. Mitchell go to college?

25   A.   He did.
```

```
1    Q.  Where did he go?

2    A.  He went to Miami-Dade College.

3    Q.  Did he graduate?

4    A.  Yes, he did.

5    Q.  What was his degree in?

6    A.  Criminal justice.

7    Q.  When was that?

8    A.  In 2016 or 2017, thereabouts.

9    Q.  After he graduated did he get a job?

10   A.  He did.

11   Q.  Where did he work?

12   A.  He was working at the Port of Miami working as an agent

13   with the cruise lines, assisting their supervisor when he left

14   and he also worked at Wild Wings interim before the port job.

15   Q.  So after graduating college but before the port job he

16   worked at Buffalo Wild Wings?

17   A.  Yes, sir, and Ross, I'm sorry.  He did security at Ross.

18   He had small jobs prior to trying to get his job going.

19   Q.  And how long did he work at the Port of Miami for?

20   A.  I want to say Aaron was there for about nine months.

21   Q.  Do you remember the year?

22   A.  He stopped just before COVID, so that was what, 2020?  So

23   he was there in 2019.

24   Q.  And then after his job at the terminal, what did he do?

25   A.  He went out to Arizona and was working with CBP.
```

1   Q.   When did he go out to Arizona?

2   A.   In June of '20 -- what are we in, '22?  2021.

3   Q.   Prior to him going to Arizona, had he ever lived outside of

4   the state?

5   A.   He did a summer at Tallahassee at FAMU but then he came

6   home to help me with his ill grandmother and his sisters and he

7   finished school at Miami-Dade.  That was the extent of living

8   away from home.

9   Q.   If Mr. Mitchell were to get a bond in this case, would he

10  be able to live with you and his father?

11  A.   Absolutely, all our children are always welcome home.

12  Q.   Prior to his surrender at the FBI, where was he living?

13  A.   With us at home.

14  Q.   As far as you know, Ms. Mitchell, has your son ever had any

15  issues with drugs or alcohol?

16  A.   No, sir.

17  Q.   Has he ever been arrested for anything prior to this

18  incident?

19  A.   No, sir, model child.

20  Q.   I think those are all the questions I have for you,

21  Mrs. Mitchell.  I appreciate it.

22  A.   Thank you.

23           MS. CHA:  No questions from the Government.

24           THE COURT:  Thank you for coming forward, Ms. Mitchell.

25           THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  Watch your step there.

2          Okay.  Mr. Jacobs, anything else?

3          MR. JACOBS:  No further questions, Your Honor.

4          THE COURT:  All right.  I know it's the Government's

5    motion.  I am going to tell you, though, Mr. Jacobs, two

6    things.  Your argument that relying on the weight of the

7    evidence put me back on my heels, I am not going to lie, like

8    really gave me pause because the case -- the motion for

9    detention travels on the weight of the evidence, except I am

10   not sure that I agree with that characterization anymore

11   because I have been thinking about this almost continuously

12   since your motion was -- your memo was filed.

13          And, again, I have had a lot of time to think about

14   this before this started and I come to you with an open mind

15   and with questions, but it seems to me that there is a fulsome

16   presentation of all of the 3142 factors here, and I think it

17   still very heavily weighs in favor of detention.  And I'll tell

18   you why so that you can respond in any way that you see fit.

19   This is without prejudice to you making the argument you would

20   have made without the benefit of my concerns.

21          It seems to me that, at a minimum, there is either no

22   dispute or such objective evidence as to not be able to

23   meaningfully dispute these facts.

24          Mr. Mitchell is a law enforcement officer.  On that day

25   in April he was a law enforcement officer who displayed on his

1    body the fact that he was a law enforcement officer.

2          He took a child from her school while wearing that

3    displayed police signage on his body to his apartment.

4    Whatever happened after that is the subject for another

5    proceeding at this point, I think, but when confronted with the

6    accusations that he had had this child in his apartment, his

7    story is meaningfully contradicted in at least two respects by

8    the objective evidence, which as you know -- because I know

9    that you give a very good closing argument -- evidences

10   knowledge of guilt or the fear of a guilty conscience, that is,

11   with respect to the backpack and whether or not he departed the

12   car by himself or with the child.

13         Only liars need good memories prosecutors always say in

14   closing argument, so these details are not small, as far as I'm

15   concerned, the day after the child visited his apartment.

16         Okay.  Traveling only on those facts and without even

17   consideration of the horrific nature of the allegations, this

18   is someone who abused a position of trust for the most

19   vulnerable in our society and then lied about it.  Everything

20   about that indicates to me that this is someone who,

21   notwithstanding his personal characteristics and the very

22   loving attentive support of a family unit that is here and that

23   is always meaningful to me, snapped or broke.

24         And his ability to abide by a condition of bond and not

25   be a danger to the community -- I tend to agree with you that

1    risk of flight here can be overcome by conditions.  It just

2    could.  This is a family unit that I think could keep him under

3    house arrest, but his danger to this community, to "the

4    community" I don't think can be addressed because of those

5    personal characteristics.  I don't think it's limited to the

6    weight of the evidence but, legally, I'm also not sure that I

7    agree with your argument because the presumption of innocence

8    will carry with him from this proceeding.  Notwithstanding, I

9    have, obviously, as I must at every detention hearing, weighed

10   the evidence and particularly that objective evidence that has

11   been presented to me and has been meaningfully disputed.

12          So I have to do that at every detention hearing, and

13   that does not prejudice his position going forward and the

14   presumption of innocence that cloaks him at every stage of this

15   proceeding until a jury decides otherwise, but you really made

16   me think about that.

17          So those are my concerns.  Just to narrow it, if I rely

18   just on those facts that are neither dependent on

19   uncorroborated allegations, if I rely just on those objective

20   facts, it seems quite clear and convincing that this defendant

21   presents a danger to the community that cannot be reasonably

22   assured with conditions of bond.

23          MR. JACOBS:  Can I respond, Your Honor?

24          THE COURT:  Please.

25          MR. JACOBS:  Thank you.

```
 1              So, two things, I guess, to start with.  From a legal
 2    framework perspective, there are circuits who have said that
 3    the weight of the evidence is one factor that the Court must
 4    consider, but it is the least important factor in terms of
 5    detention hearings, and that's the position the Ninth Circuit
 6    takes.  If the Court wants a citation, I can provide that.
 7              But even setting that aside, Your Honor, I think the
 8    same conditions that Your Honor has just said can guarantee
 9    that he is not a risk of flight, staying with his family, home
10    detention, GPS monitoring, third party custodian, even, it
11    wasn't in the memo, but a percentage bond, the family could put
12    up some money for a percentage bond, all of those same factors
13    are the same types of conditions that I think would guarantee
14    the safety of the community.
15              Plus, and I don't mean to repeat what's in the memo
16    because I know the judges hate when lawyers do that, but
17    Mr. Mitchell's history for the last three months when he has
18    been on bond have -- you know, he has a flawless record on
19    bond.
20              THE COURT:  I don't mean to interrupt you but you know
21    that I often look to how has he complied in the past.
22              This is such an unusual defendant.  This is such an
23    unusual set of circumstances where nothing in his past would
24    have indicated that this is coming, so it is -- I find myself
25    in an odd situation of saying those three months, if the last
```

1   27 years, if the child that Ms. Mitchell just described is

2   accurate, then there was no way to see this coming, so I don't

3   see how I see the last three months as an indicator that he

4   would comply with bond unless and until whatever triggered him

5   on the 27th to pick that child up happened again.

6           MR. JACOBS:  You see, Your Honor, this is where we

7   disagree with how to weigh the weight of evidence and how the

8   presumption of innocence comes to play in detention hearings.

9           I don't think that the Court should use the

10  allegations.  I am not disputing the seriousness or even the

11  weight of the evidence the Government has.  I am not disputing

12  that, but to use those allegations to discount, again, like

13  Your Honor said, 27 years of good behavior, both before this

14  incident and after this incident, I just don't see how --

15          THE COURT:  I understand.  I have had the benefit of, I

16  don't know, 48 concentrated hours of thinking about this and,

17  ultimately, because I really did consider whether or not it

18  would be legal error and to what extent a decision, if one was

19  then made, because I didn't know what else you would present.

20  I didn't know Ms. Mitchell was coming in, but if the decision

21  was how the Government had argued it based primarily on the

22  events that are described in the memorandum, would that be

23  legal error.

24          Here is my issue with it.  I don't know, but factually,

25  in this case it is predominantly the characteristics of the

1    defendant that call me to question whether or not a bond could

2    reasonably assure this community because of the fact that he

3    abused a position of trust and lied about it afterwards, lied

4    about details that evidence objectively showed he was lying

5    about.

6         It is -- in my mind, I -- Mr. Jacobs, you know that I

7    see dangerous and heinous crimes at detention hearings all the

8    time, and I have to give it whatever weight I do at the time of

9    the detention hearing.  It is those two factors that give me

10   more pause than anything else with respect to Mr. Mitchell and

11   whether or not he will abide by a bond or whether he thinks he

12   can get away with being in that special position of trust

13   again.

14        MR. JACOBS:  Your Honor, I'd like to focus, Your Honor,

15   on the practicalities of the bond itself because I understand,

16   you know, that in the abstract we have these allegations where,

17   yes, he could snap -- as Your Honor is saying, maybe he could

18   snap at any moment, but if you look at the actual conditions of

19   the bond, Mr. Mitchell will be basically confined to his

20   parents' house.  He will have a GPS monitor on him.

21        He is no longer a border patrol officer.  He no longer

22   has this mantle of authority that he allegedly abused.

23        His mother, as Your Honor said, they have a strong

24   family unit.  Mr. Mitchell is not going to -- maybe -- again, I

25   am speaking solely on the allegations.  If the Government

1    thinks that he betrayed the United States' trust as a border

2    patrol officer, etcetera, etcetera, this individual is not

3    going to betray his family.

4         His mother -- they have put up $20,000 in the state of

5    Arizona.  He received a bond there, and the, you know, the

6    state prosecutor there had, I would say, 95 percent of the same

7    evidence that is now present before the Court.  And the state

8    prosecutor there stipulated to a bond.  The Court signed off on

9    it.  Then they modified it to allow him to leave the state and

10   come to Florida.

11        I think these are very important pack factors, but

12   going back to the practical considerations of this bond.  He

13   will be at home.  He will be with his mother.

14        THE COURT:  Hold on.  What is the additional evidence

15   that has become available?

16        MR. JACOBS:  I assume that it's the phone, but it's

17   unclear to me because based on the conversation with the

18   special agent, it seems like they had everything within a few

19   days of his arrest.  So I'm not -- you know, the Government in

20   their motion said that there is new evidence that the state

21   court did not have.  I assume it's the phone, but I don't know,

22   Your Honor.

23        THE COURT:  Okay.  I will have Ms. Cha confirm, but it

24   seems to me from the time line it will be the surveillance from

25   the apartment complex.

1          MS. CHA:  Your Honor, just to clarify.  I don't know

2    the timing of the phone and whether it had been dumped.  I

3    would be surprised if the phone had been dumped and produced to

4    defendants prior to the bond hearing, but I don't know that for

5    certain.

6          THE COURT:  I think what you traveled on was a

7    screenshot that agents saw at the time of his arrest.

8          MS. CHA:  Correct.

9          THE COURT:  So I didn't think it was at least what you

10   proffered in the memoranda, the search history that was new.

11   So it seemed just from a timing perspective to me that it could

12   only be the apartment surveillance and the second SANE exam.

13         MS. CHA:  Your Honor, yes, correct, Your Honor, the

14   second SANE exam which showed evidence of anal trauma.

15         MR. JACOBS:  But even the second SANE exam was May 10th

16   and his bond was modified May 17th.

17         THE COURT:  Modified, right, but it had already been

18   stipulated to and entered immediately after he was picked up on

19   the 26th.  Right?

20         MR. JACOBS:  Yes.  So he was -- I think the time line

21   is arrested on the 26th, arraigned on the 4th, and that's when

22   the state bond was set.  A SANE exam, a second SANE exam was on

23   the 10th, and then on the 17th the bond was modified.

24         THE COURT:  Okay.

25         MR. JACOBS:  But, again, going back to the terms and

1   conditions of our proposed bond, Your Honor, third party

2   custodian, both parents are willing to sign.  Again, they are

3   willing to put up even more money.  I just don't see -- again,

4   focusing on his history and characteristics, I don't see

5   Mr. Mitchell fleeing or committing another crime that would, in

6   all likelihood, result in severe sanctions for his family and,

7   I mean, embarrassment to his mother, embarrassment to his

8   family.  I just don't see that.

9        There is no evidence -- first, there is no evidence

10  proffered by the Government that he would snap again.  His

11  mental health is just not in -- there is nothing about it in

12  evidence.  As Your Honor knows SF-86, polygraph, background

13  check, all of these things are looked into.  So, again, all of

14  the history and characteristics, other than the weight of the

15  evidence and the allegation favor giving Mr. Mitchell a bond.

16       He has no history of drug abuse, of alcohol abuse, of

17  any of the things that Your Honor typically sees.

18       Typically, when Your Honor sees a case, you know, a

19  serious or especially heinous case, the defendant usually has

20  other factors weighing towards detention.  Usually it's

21  criminal history.

22       Here we don't have any criminal history, at all.  And

23  it's not even -- his record is clean but it's especially clean

24  because he was able to get a federal job as a border patrol

25  agent, and we know that, again, from the SF-86, and I believe

1   on that website of border patrol, I believe a polygraph was

2   required.

3         But he won't be in the community is the bottom line of

4   my point.  Under the conditions of the bond, he just won't be

5   in the community.  He is not currently employed, so we are not

6   asking for any exceptions where he will travel within the

7   community to go to and from a job.  The only place he is going

8   to travel to, Your Honor, is the District of Arizona for court

9   dates.  Otherwise, he is going to be at Mrs. Mitchell and

10  Mr. Mitchell's home here in Florida with a location monitor.

11        THE COURT:  All right.  I am going to give Ms. Cha the

12  last word.

13        Mr. Jacobs, did you have a chance to make your full

14  argument?

15        MR. JACOBS:  Yes, Your Honor.

16        MS. CHA:  Thank you, Your Honor.  Your Honor, we don't

17  rely solely on the weight of the evidence as defense would have

18  it.  We rely on all the 3142(g) factors.

19        The first factor is the nature and circumstances of the

20  defense.  Here we charge him with kidnapping of a minor which

21  is a presumption case.  That strongly militates in favor of

22  detention.

23        The second, of course, is the weight of the evidence

24  which we all discussed, but the third and I'd like to spend

25  some time on this one which Your Honor has pointed out, is the

1     history and characteristics of the defendant.

2          Mr. Jacobs believes that because he passes fulsome

3     background check and passed a polygraph that this shows that he

4     is not dangerous but, Your Honor, I think it shows the exact

5     opposite.  It is precisely what allowed him to become a federal

6     law enforcement officer to receive specialized training and

7     then to be able to abuse that to kidnap and sexually assault a

8     child.

9          And, Your Honor, the fact that his badge has been taken

10    away from him, the fact that he no longer carries a CBP

11    insignia or the like, that doesn't preclude him from committing

12    other offenses.  You can go off on Amazon.  You can go to your

13    local costume store and you can still receive all the trappings

14    of the law enforcement officer.

15         Your Honor, I want to talk about a case that the

16    defense cited, and it's U.S. v Fiandor in his brief.  It's a

17    Southern District of Florida case which I understand was

18    decided by Judge Moore.

19         You know, defense cited to this case for the

20    proposition that because the defendant self-surrendered he

21    wasn't a flight risk.  The very next sentence in that case

22    Judge Moore held that the defendant should be detained because

23    he was a danger to the community.  In that particular case, the

24    defendant was charged for planning to impersonate officers and

25    rob drug houses of drugs.  And the Court held the fact that he

1    planned to impersonate a cop, in and of itself, was what made

2    him so dangerous.

3          And I am reading from the opinion, more damaging than

4    these facts -- it's referring to the defendant's criminal

5    history -- is the nature of Fiandor's alleged criminal

6    activity.  Fiandor and his compadres allegedly impersonated law

7    enforcement officers in order to rob residences of drugs and

8    money.

9          Your Honor, if the defendant in Fiandor is dangerous

10   because he has alleged to have impersonated law enforcement

11   officers to be able to rob drug dealers of drugs, how much more

12   so is the defendant who actually is a real federal law

13   enforcement officer, although he has been fired, who used and

14   abused his law enforcement privileges to kidnap and rape a

15   child who was waiting for school.

16         Again, Your Honor, we would submit that even though he

17   doesn't have his badge anymore, these are easy things that he

18   could be able to get counterfeit.

19         The last thing I would want to point out on this

20   dangerousness is that the District of Arizona and the Southern

21   District of Florida are very similar in that they have a very

22   multicultural population and many people who may fear law

23   enforcement and fear immigration consequences if they come in

24   contact with law enforcement.

25         And the defendant has shown in the instant case that he

1    preyed on a vulnerable child, a child he knew who lived in

2    Mexico and crossed the border into the United States to, I

3    would submit, Your Honor, because he believed that she would

4    not report him for immigration consequences, and I would

5    submit, Your Honor, that all the reasons why the District of

6    Arizona was a place in which the defendant was able to commit

7    his activity and his crimes, those circumstances also exist

8    here in the Southern District of Florida.

9         The defense has argued for home confinement but, Your

10   Honor, we do not believe that would reasonably assure the

11   safety of the community.

12        He could leave his house.  A monitor does not confine

13   him into his house.  As Your Honor has pointed out, he went

14   27 years and this happened.  He has done three months.  There

15   are still many more months.  Who knows what could happen, and

16   given the danger he poses to the community, I don't believe

17   that that is a risk that could be mitigated with a home

18   monitor.

19        THE COURT:  Mr. Jacobs, do you want to respond?

20        MR. JACOBS:  Yes, Your Honor.

21        So, one thing that bothers me, Your Honor, is if

22   Mr. Mitchell, like so many of our clients and so many

23   defendants who appear before you, if he had even one thing in

24   his criminal history, we wouldn't even be having this

25   discussion.  But the fact that he has no criminal history and

1    the fact that he has spent three months under a bond that the

2    state agreed to in Arizona, allowed him to travel across the

3    country to Miami where he has done all the right things for

4    three months, to not consider that or to heavily discount that,

5    I think is -- it's just wrong under the Bail Reform Act.

6           I think it must be considered and I think it weighs

7    heavily in favor of a bond.

8           He has been on a bond.  He has shown that he has done

9    well on a bond and, therefore, he should receive another bond.

10          I -- it just bothers me, Your Honor, that the

11   Government talks about all of this potential for future

12   criminal conduct while on bond, and, yet, he has demonstrated

13   over the last 90 days that he hasn't come close to committing

14   any future criminal conduct.  He has abided by the terms of his

15   bond and giving him a federal bond that is substantially

16   similar to a state bond, all the evidence shows that he will

17   continue to comply.

18          I think that's the only thing I needed to respond to,

19   Your Honor.  Thank you.

20          THE COURT:  Okay.  All right.  I am going to recess for

21   a minute.  I have meant that I wanted to keep an open mind and

22   come in here and I want to give this another thought before I

23   make findings and determinations and we will be right back.

24          COURT SECURITY OFFICER:  All rise.

25          (Brief recess.)

1           THE COURT:  Thank you for everyone's patience.  It is,

2     obviously, an important decision, you can all be seated, and

3     one that I don't take lightly.

4           There are -- Mr. Jacobs, I am going to enter an order

5     of detention, and I will explain why, but more fulsome

6     explanation will be in my written order because I would

7     anticipate whichever way this was decided that one side or the

8     other would want to appeal it, so I will have a fulsome written

9     order.

10          The inquiry is two-fold.  Does he present a danger to

11    the community or a risk of flight?  Yes and yes.  So, the risk

12    of flight by preponderance, the Government here has shown and

13    danger to the community by clear and convincing objective

14    evidence.  That doesn't end my inquiry.

15          Are there conditions that would reasonably assure us?

16          As I have indicated, I am not holding him on risk of

17    flight.  I think the conditions here would be adequate to

18    reasonably support his appearance in court.

19          I have very heavily considered Ms. Mitchell's testimony

20    and her appearance here in court as well as everything that,

21    again, I think I know about Mr. Mitchell because it's not

22    meaningfully disputed by anybody, including the factors that I

23    listed, his employment history and so forth.  But with the

24    color that Ms. Mitchell provided me about his education and

25    background and the conditions that you have presented and

1   argued are as stringent as they can possibly be and ultimately

2   the question comes down for me, do I think that even with a

3   third-party custodian, that is, his parents and the house that

4   he has been in, do I think that -- do I find that that is

5   enough to reasonably assure the safety of the community, and

6   here I find that it is not for several reasons.

7          It depends, in fact, on human compliance.

8          I understand your point and it is very well made that I

9   have evidence that he has complied.  I have a very small litmus

10  test of where he has complied these last 90 days.

11         I don't know on a different record if it was longer if

12  it would be more meaningful to me.  I suspect, candidly, that

13  it might not be because the -- there is a certain amount of

14  unpredictability.  There is an absence of indicators in his

15  background that would suggest that this criminal activity was

16  likely afoot or anything else, and that is another piece,

17  frankly, that makes it very difficult for me to assess and give

18  meaningful value to the opportunity for a third-party custodian

19  to mitigate against the very significant risk that Mr. Mitchell

20  presents to the community.

21         So, I would do a better way of explaining it in the

22  written order, but I wanted you to understand the rationale,

23  and if you think that I have misunderstood it -- although,

24  honestly, I went back to the memoranda and reminded myself of

25  two facts.  I know we didn't go too far down any factual

1    proffer but the fact that when he came home and saw law

2    enforcement he accelerated past his apartment complex and the

3    fact that when he took the victim out of the car he draped her

4    with a jacket to conceal the handcuffs, and my point being that

5    I have, I hope, considered this record as fulsome as I can, and

6    notwithstanding my finding that he presents a danger by clear

7    and convincing evidence, I have considered all of the

8    conditions and I make the determination here that a third-party

9    custodian under this circumstance would not mitigate that risk.

10          So I will enter a written order and this is why I try

11   to do all those other proceedings before the detention hearing

12   because we have otherwise forgotten to now take up the removal

13   hearing.

14          So, Mr. Mitchell, that's my ruling.  I will enter a

15   written order.  I want to, again, acknowledge Ms. Mitchell for

16   being here under very difficult circumstances.  I credit your

17   testimony.  I appreciate the support you have shown your son

18   and hope that you will continue to do so because he is going to

19   need it.  So I don't want you to think I minimize or discredit

20   what you said to me here today.  I don't.

21          Okay.  But with that, I think that is all we have left

22   to do in this case, Ms. Cha, unless there is anything else.

23          MS. CHA:  Nothing else from the Government.

24          THE COURT:  Okay.  I will enter the order of

25   commitment.

1          Mr. Jacobs, is there anything else?

2          MR. JACOBS:  No, Your Honor, thank you.

3          THE COURT:  I had an unusually excellent detention

4   hearing.  Notwithstanding the result, I understand that you and

5   Mr. Mitchell may be disappointed in the ruling, but I am really

6   very grateful, frankly, for both the evidentiary and legal

7   presentation that you have made.

8          MR. JACOBS:  Thank you, Your Honor.

9          (Proceedings were concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      C E R T I F I C A T E

 2

 3

 4

 5           I, Patricia Diaz, Registered Professional Reporter,

 6   in and for the United States District Court for the Southern

 7   District of Florida, do hereby certify that I transcribed from

 8   digital audio recording the proceedings had the 1st day of

 9   August, 2022, in the above-mentioned court; and that the

10   foregoing transcript is a correct and complete transcript of

11   said digital audio recording.

12

13

14   August 22, 2022        /s/Patricia Diaz
     DATE                    PATRICIA DIAZ, FCRR, RPR, FPR
15                           Official Court Reporter
                             United States District Court
16                           400 North Miami Avenue, 11th Floor
                             Miami, Florida 33128
17                           (305) 523-5178

18

19

20

21

22

23

24

25
```